DeCARLO, Judge.
Murder, second degree; fifteen years.
The indictment charged the appellant, Janice Lee Hansen with “unlawfully and with malice aforethought” killing Max Ray Copeland “by shooting him with a pistol.”
The appellant was represented at trial by court-appointed counsel and is represented on this appeal by appointed counsel.
The facts presented by the State in support of this indictment, are as follows:
On March 27, 1978, Susan Marie Jordan was working as a bartender in the “Cheyenne 76 Club” in Madison County, Alabama. She stated that, on the night in question, the appellant and Billy Mayes arrived at the bar before Ricky Watson, Larry Harper and the victim. She said that the others were all drinking, but none was intoxicated.
According to Ms. Jordan, Harper and the victim came in together and had been in the bar approximately five minutes when the shooting occurred. She testified that, at the time, she was behind the cash register and was looking down at the counter when she heard the gunshot. She said that, at that point, she turned around and saw “Bil *565 ly and Janice trying to get the gun. You know, they were harassing over the gun and Janice ended up with it.”
Further, she stated that, just prior to the shooting, she saw the victim sitting at the end of the bar. She stated that she did not hear any conversation or argument between the appellant and the victim or hear anyone say, “I’m going to cut you.” She also acknowledged that she did not see “any confrontation at all” between Mayes, the appellant, and the victim.
The witness said that, after the shooting, she saw the appellant lying on the floor two or three feet from the bar and said that he did not have a knife in his hand, nor was there one anywhere around. However, she went on to say that, after the shooting, the police found a knife in the victim’s pocket.
During cross-examination, Ms. Jordan testified that she did not believe the juke box was playing at the time of the incident. Further, she stated that, immediately after the shooting, the appellant and Mayes left the bar, and, within two or three minutes after they left, she called the police.
Ricky Allen Watson testified that, on the day of the shooting, he had gone to the Cheyenne Club about “eight or eight-thirty.” According to Watson, when he arrived, the appellant and Mayes were already there, and Harper and the victim arrived about thirty minutes or an hour later.
Watson stated that, within five to ten minutes after they arrived, the shots were fired. He recalled that, just prior to the shots, the victim had walked by him and appeared to be walking to the door. Watson testified that he did not see any confrontation between Mayes, the appellant and the victim, and did not see Copeland draw a knife. Further, Watson said he did not hear any conversation, nor did he hear the victim say he was going to cut anyone. Watson went on to say that the only “scuffle” he saw was “when [the appellant] was bringing the gun down and Mr. Mayes was probably reaching after it. . ”
Watson acknowledged that, immediately after he heard the shot and turned around, he saw the appellant with the gun in her hand. He said that Mayes and the appellant left “pretty shortly after that.”
Watson also stated that, after the victim had been shot, he did not see a knife in his hand, nor did he see a knife in the victim’s hand when Copeland had walked past him previously.
Larry Samuel Harper, who was also known as “Rabbit,” testified that he and the victim arrived at the Cheyenne Club between 8:30 and 9:00 P.M. He said that, when they went into the bar, the appellant, Mayes, Watson, and the bartender were there. According to Harper, after they arrived, he and Copeland sat at the bar and talked with the bartender for a few minutes and ordered a drink. After a minute, the victim asked him for a light. According to Harper, Copeland told him he had left his lighter in the van. Copeland then took a sip from his drink, got up and started around the bar.
Harper stated that Copeland did not say anything to him about Mayes and did not say anything when he got up. He recalled that the other man did not say anything about cutting anybody or getting in a fight with anyone. Harper also said that he did not hear Copeland talking with anyone pri- or to the shooting.
Harper testified “[W]hen I looked up, Mr. Copeland grabbed the side of his head and hollered oh, and fell to the floor on his back.”
Harper said, at that point, he got up and walked about half the length of the bar when he saw Mayes and the appellant with the gun “between them.” He said that the appellant had her back to him at that time, but she “broke away from Mr. Mayes and came around and pointed the gun at me.” Harper said he then “hit the floor and turned around the corner of the bar and got in the bathroom.”
The witness said he “didn’t see which one pulled the trigger” but did see Mayes and the appellant “scuffling over the gun.” *566 Further, he stated that, when the appellant pointed the gun at him, Mayes “run up behind her and grabbed her and by that time I was around the corner of the bar.” Harper said he remained in the bathroom until they left and then went outside and saw the two drive away in a “yellow Dodge van.”
James Parker, a “Crime Scene Technician” with the Huntsville Police Department, testified that, on the day in question, he had gone to the Cheyenne Club with another technician, Officer Larry Brewer. He stated that, when they arrived, Sgt. Collie and other officers were already present.
Parker said that he and Brewer had photographed the scene and he identified State’s Exhibits 1 through 9 as photographs taken at that time.
The witness recalled that, after Mr. Ber-ryhill of the coroner’s office arrived, the personal effects were removed from the body of the deceased. He said that among those effects were a handkerchief, a keyring, forty-five cents in change, a brown leather wallet, and a package of Marlboro cigarettes. From the right front pocket they removed “one pocket knife with [the] blade shut.” Parker recalled that this was the only knife he found on or about the victim’s body.
Parker testified that, about 11:00 or 11:30 P.M., he drove to Arab, Alabama, where Chief Bannister of the Arab Police Department turned over to him a .38 Smith and Wesson pistol and a “Buck pocket knife.” He said that he also saw the appellant and Mr. Mayes there.
Parker recalled that, at the time the pistol was turned over to him, it contained “one spent round” and four live rounds of ammunition. He testified that the weapon, as well as the other items he had taken at the scene, were kept in his possession until they were turned over to the State Toxicologist.
Jack Bannister, the chief of police of the City of Arab, identified the pistol and knife which he had turned over to Detective Parker and stated that he had received them from Arab Police Officer Sowder. He stated that these items had remained in his possession for about an hour when he turned them over to Detective Parker of the Huntsville Police Department.
During cross-examination, Chief Bannister said that he had known the victim all of his life time and was not aware that he had a reputation for violence. On further questioning, he said that the victim did not have a reputation for violence in Arab. Bannister added that the victim had been arrested for disorderly conduct but he would not say he had been violent.
James E. Sowder, a part time auxiliary policeman for the Arab Police Department, recalled that, on the night in question, he was working with Sgt. Wooten. He stated that they had stopped a van occupied by the appellant and Mayes at the “Jitney Junior” in Arab, Alabama.
Sowder said that, at that time, the appellant stepped out of the van and, as he approached her, she indicated that something was under her sweatshirt. He said he noticed a “little bulge” and when he patted the sweatshirt, he felt the butt of a weapon. He said he removed a weapon from the waistband of the appellant’s pants and that, shortly afterwards, a pocket knife was removed from her left shoulder pocket.
Sowder said that the knife and the .38 Smith and Wesson pistol were turned over to Chief Bannister. He also recalled that at the time he took the pistol in his possession it was loaded with five rounds and only one round had been fired.
Perry Petty, a homicide investigator with the Huntsville Police Department, testified that he investigated the homicide at the Cheyenne Club on the night in question and examined the body of the deceased. Further, he stated that he had seen the personal property removed from the body and identified the knife which was taken at that time. He said that there was no other knife found on or about the body at that time.
*567 Petty stated that he and Detective Howard Turner drove to the Arab Police Department on that night and saw the appellant in custody there. Petty said that he read the appellant her “rights” and she had replied that she understood them. He stated that no one threatened her or offered her any hope of reward to get her to make a statement.
At that point, the jury was excused and, out of the presence of the jury, Detective Petty testified that, when he and Detective Turner went to the Arab Police Department, they told the appellant that she would have to return to Huntsville. At that time, the appellant stated that there was “no need” for Billy Mayes to return and said, “I’m the one who done it.” Petty said it was after this statement that he read the appellant her “rights” and said that she also made the statement on the trip back to Huntsville “that she was trying to shoot over his head.”
Petty testified that the second statement was made after the appellant had inquired about the victim and was told that he was deceased. Petty said that, prior to the first statement, the investigation had focused on the appellant and she was in custody, but he had not asked her for a statement.
According to Petty, that statement was made after he had introduced himself and had told her she had to return to Huntsville. It was at that time that she said, “there is no need in Billy [Mayes] going back, I’m the one who done it.”
At that time, the defense attorney objected that the statement was not made voluntarily and that the appellant had not been adequately warned of her rights. The court overruled the objections and the jury was returned to the jury box. Officer Petty testified, before the jury, that he had not had an opportunity to advise the appellant of her rights prior to her making the statement that “there is no need in Billy going back, I’m the one that done it.”
Further, he testified that, after he read the appellant her rights from a Miranda card, she asked about the victim. Petty stated that he told her that Copeland had died and, at that time, she had told him she was trying to shoot over his [Copeland’s] head.
On cross-examination, Petty said that the appellant’s statement was not made in response to any questions he had asked her.
Brent Wheeler, of the Alabama Department of Toxicology and Criminal Investigation, stated that he was present when an autopsy was performed on the victim, and that, at that time, he received a projectile bullet which had been removed from the body of the victim by John Kilboum, director of the Florence Laboratory. Wheeler testified that he later made a comparison of the bullet with a bullet fired from State’s Exhibit 12 (the weapon taken from the appellant) and stated that it was his opinion that the bullet removed from the head of the victim was fired through that weapon.
John Kilbourn, of the Alabama Department of Toxicology and Criminal Investigation, testified that he had examined the body of the victim on March 27, 1978, and found an entrance wound located on the left side of the head and that the path of the bullet went “straight across the brain and slightly upward.” He testified that it was his opinion that “[d]eath was due to cerebral trauma due to the gunshot wound.”
At the completion of Mr. Kilbourn’s testimony, the defense made a motion to exclude the State’s evidence on the grounds that the State had “failed to prove that the victim was free from fault in bringing on the altercation.”
The motion was overruled and Billy Mayes was called as a witness on behalf of the defendant. He testified that he had known the appellant since the October before the shooting. He said that he had also known the victim all of his life and that he had previously had a fight with Copeland. Mayes explained that it was during that fight that Copeland had cut him on the side of his face.
The witness recalled that, on the night in question, he was at the Cheyenne Club with *568 the appellant and that, when he stood up to go to the bathroom, Copeland bumped into him and called him an “S.O.B.” Mayes said that, about the same time, the appellant had walked up beside him and Copeland called her a “road whore.” According to Mayes, at that point, the victim “started for his knife, and when he come up with it, fixing to cut, he had it up here and I seen the jaws of it, and that’s when she shot him.”
Mayes further testified that he had known Copeland all of his life and that they both lived in Arab, Alabama. He stated that Copeland had a reputation for carrying a knife and that his reputation in the community for violence was “bad.”
During cross-examination, Mayes said that Samuel Harper was sitting at the bar until he and the victim met each other “and when Janice come up beside me I remembered he had started running around the bar towards us, and then she saw him and he froze and stood there.”
Bobby Broadway was Billy Mayes’ partner in the construction business. He testified that he had known the victim for only “about nine months” but that he had heard about him. He said that the victim’s reputation with regard to violence was “bad.”
Janice Hansen took the stand in her own behalf and testified that the victim had been identified to her, prior to the shooting at the Cheyenne Club, by Billy Mayes. She said that, when she and Mayes arrived at the Cheyenne Club about 7:30 P.M., she did not notice whether the victim was already there. She said that, while she and Mayes were sitting at the table, Mayes indicated to her that a man at the bar was “Max.”
The appellant said Mayes then told her that he had to go to the bathroom and, as he was getting up, the victim came over to them and “knocked into Billy.” She said she heard him call Billy a “son of bitch.”
The appellant then gave the following testimony:
“So, I got up and I seen him going around and he pulled out a knife out of his pocket, and he was saying he was going to cut Billy and the road whore that was with him. . . . and while I was getting up at that time and I was scared when I knew he was in there, and I didn’t think Billy would be able to do anything with him if he did come out with a knife. So, I figured since I had that gun I’d just shoot up in the air and scare him and when I stood up, everything went kind of black like, because I got dizzy. We hadn’t eaten that day and had been drinking, not much, but still I was dizzy headed.”
The appellant said that she did not remember pulling the trigger or how the gun went off. However, she said that she did remember hearing the sound. Further, she stated that she remembered seeing “the flash of the blade” of the knife in Copeland’s hand.
The witness testified further that Mayes had not called Copeland over nor had they made any obscene gestures toward him. Further, the appellant stated that she did not feel she had killed Copeland and added “[i]f I shot him, it was not intentional.”
I
The appellant contends that she had been denied “her right to trial by jury and on the indictment as contemplated by the legislature and guaranteed by the constitution.” She complains that she was indicted, tried and convicted by venire persons empanelled according to a statutory scheme which had been “expressly repealed.”
The sole issue raised by this appellant concerns the interpretation of a legislative enactment.
The shooting in which the victim in this case was killed occurred on March 27, 1978. On April 27, 1978, Act No. 594 of the 1978 Regular Session of the Alabama Legislature became law. The appellant, Janice Lee Hansen, was indicted on May 12, 1978. On June 26, 1978, the venire was drawn to establish a list of prospective jurors to serve during the week of August 21, 1978. The grand jurors and the list of prospective jurors for that week were selected according to the old law, (§§ 12-16-2, 12-16 — 4, *569 12-16-5, 12-16-39, 12-16-41, 12-16-42 and 12-16 — 43, Code of Alabama 1975.) On July 7, 1978, the appellant’s case was docketed and set for trial the week of August 21, 1978.
On August 7, 1978, during a special session of the Alabama Legislature, Act No. 594 was amended by Act 14 (§ 12-16-58, Code of Alabama 1975, 1978 interim supplement). This amendment dealt exclusively with establishing a time provision for the implementation of Act No. 594.
On August 21, 1978, the appellant filed several motions, among which was a motion to quash the jury venire. The motion alleged fraud and denial of equal protection of the law because prospective jurors were chosen under a scheme that had already been “expressly repealed.” The motion was denied after a hearing on August 24, 1978.
At that time, the jury venire was qualified by the court without objection. Later in the day, the jury venire was dismissed on appellant’s motion due to her illness. She was again called for trial on August 28, 1978, and the jury returned a guilty verdict on that day.
At the outset, we note that the Supreme Court of Alabama, in Bracewell v. State, Ala., S.Ct.Ms. 78-249, May 25, 1979, in determining the effective date of a statute applicable to juveniles, stated:
“Absent a clear expression in the Statute to the contrary, we think the law applicable at the time of the offense was intended to govern the offense, the offender, and all proceedings incident thereto; and we so hold.” [Emphasis added.]
In our judgment, the decision by the Alabama Supreme Court in Bracewell v. State, supra, is applicable to the case presently under review by this court. The date of the offense charged to the appellant in this case was March 27, 1978, one month before Act No. 594 was made law.
Under the rationale of Bracewell v. State, supra, the venire called and the juries subsequently selected did not come within the purview of the newly enacted Act No. 594, but were governed by §§ 12-16-2,12-16-4, 12-16-5,12-16-39,12-16-41,12-16-42, and 12-16 — 43, Code of Alabama 1975.
Therefore, after a careful examination of the record and transcript of evidence, it is our opinion that the judgment of conviction by the Madison Circuit Court should be affirmed.
AFFIRMED.
HARRIS, P. J., and TYSON and BOWEN, JJ., concur.
BOOKOUT, J., concurs specially.