Appellant* was indicted on the charge of unlawfully exploding dynamite dangerously near an inhabited dwelling. The indictment reads:
 "The grand jury of said county charge that, before the finding of this indictment, Jessie Benjamin Stoner, alias Jesse Benjamin Stoner, alias J.B. Stoner, whose name is to the Grand Jury otherwise unknown, willfully and unlawfully set off or exploded dynamite or other explosive in, under or dangerously near to the dwelling house of, to-wit: Mark E. Roberson, in which there was at the time a human being, to-wit: the said Mark E. Roberson."
The sufficiency of the evidence is raised by a motion to exclude the state's evidence and a motion for a new trial. The trial court denied both motions. We are put to a review of the evidence.
This case arose out of the attempted bombing of the predominately black Bethel Baptist Church during the racial tensions that existed in Birmingham in the late fifties and early sixties. In the early morning hours of June 29, 1958, members of the Bethel Baptist Church noticed smoke rising from a paint can placed next to the church. After the men had moved the bomb away from the church, the bomb exploded, causing considerable structural damage to *Page 173 
the church and the surrounding inhabited dwellings. After a long delay, appellant was indicted for the crime and tried by a Jefferson County Circuit Court jury. Appellant was found guilty and sentenced to ten years imprisonment.
 Summary of the Evidence
The state's first witness was Reverend Fred L. Shuttlesworth, a prominent leader of the Birmingham civil rights movement. Reverend Shuttlesworth was pastor of the Bethel Church when the church was bombed. Around 1:30 a.m. on the day of the bombing, Reverend Shuttlesworth was awakened in the parsonage by a strong vibration which caused him to fall from his bed. Reverend Shuttlesworth immediately ran to his church and noted that the church had sustained a good deal of damage from some sort of explosion. He then called the local police and the F.B.I.
On cross-examination, Reverend Shuttlesworth testified that he never saw appellant in the vicinity of the church.
Luverne McWilliams lived with her parents across the street from the church and next to the parsonage. Around 1:30 a.m. on June 29, Ms. McWilliams was given a ride home from work. While standing on her porch she noticed near the church a five gallon paint can with smoke rising out of it. She called to the guards who immediately ran to the can and moved it to the street. The can exploded, breaking out the windows of her house.
Ms. McWilliams' sister, Robbie Revis Smith, testified that, shortly after her sister had come home, she heard a loud explosion which broke out her windows, knocked the front door off its hinges and cracked the plaster. She too noted that the church had been considerably damaged.
Mark Roberson also lived across from the church. After the explosion awakened him, he noticed that the explosion had blown out his windows, causing sheetrock to fall, and had broken household objects. Debris from the explosion also dented the house's structure.
C.S. Johnson, a member of the Bethel Church, was on guard the morning of the explosion. He and the other guards were behind the parsonage when Ms. McWilliams called out that she saw smoke near the church. The guards, on approaching a paint can, recognized it as a bomb. One of the guards, Will Hall, moved the can to the side of the street where it exploded.
Mr. Johnson also testified that, in June 1958, just prior to the bombing, he and other church members were standing guard outside the church while a church meeting was being held. Mr. Johnson stated that appellant walked up to the church and asked to see Reverend Shuttlesworth so that Reverend Shuttlesworth could pray for him. After a guard refused appellant's request, appellant paused a moment and then walked away.
Aaron Rosenfield was the Fire Marshal during the time of the bombing. He had general training in the use of explosives, and had specifically studied the nature of dynamite. On the morning of the explosion Mr. Rosenfield investigated the area around the Bethel Church. He observed a round hole near the church, and detected a distinct odor of dynamite. It was his opinion that dynamite had been used. Mr. Rosenfield also testified that he had periodically returned to the church, the last time being one or two years before the trial.
Sergeant E.H. Cantrell of the Birmingham Police Department testified that, just prior to the trial, he had made measurements at the place of the bombing. The distance from the explosion to Mark Roberson's house was some 132 feet. Mr. Cantrell also stated that his part of the investigation had been going on for some four or five years prior to the trial and the investigation report in this case was an "ongoing report."
Lieutenant Tom Cook, a retired Birmingham police officer, was also called to the scene of the church bombing immediately after the explosion. He saw a large hole near the church and noticed that the church was damaged. *Page 174 
Lieutenant Cook testified that he was involved in a conversation with appellant on June 21, 1958, a week before the bombing. Also involved in the conversation were a fellow officer, Captain G.L. Pattie, and a Klan member turned informer, Hugh Morris. Captain Pattie was deceased at the time of the trial.
The conversation occurred inside a parked car in a Birmingham hotel parking lot. The police officers were undercover and Cook introduced himself as "Ted" Cook, while Captain Pattie introduced himself as "Edwards."
The police detectives told appellant that they were Birmingham steel workers interested in "the movement." Captain Pattie told appellant that they were interested in a possible bombing similar to the unsuccessful attempted bombing of a Jewish synagogue the previous April. Captain Pattie said that they were interested in helping whoever had been doing this type of thing but they were not interested in a "dud" like the synagogue bomb.
Lieutenant Cook further testified that appellant stated that he could handle any type of bombing and that he had people who were experts at bombing. If these people were paid, they would agree to set a bomb that would go off and damage almost any sort of building. Appellant allegedly claimed that for $2,000 he would get his people to make a bomb and place it wherever the officers suggested. No particular target was designated, but several targets were mentioned including the Bethel Church and the Birmingham News.
When the Bethel Church was mentioned by one of the officers, appellant replied that he knew where the church was and was familiar with the layout because he had been to the church. Appellant observed that the church would be difficult to bomb because of its all black neighborhood location, but he and his boys would bomb any place, including the Bethel Church.
Appellant then said that he could obtain explosives without signing for them. He also stated that he had seen a bomb already made up which consisted of loose dynamite placed in a bucket.
Lieutenant Cook testified that no agreement was made to bomb the church or any other target. The conversation ended when Lieutenant Cook told appellant that his group could raise the $2,000 and decide on a location and they would notify him.
The Bethel Baptist Church was bombed on June 29, 1958. On July 12, 1958, the same participants in the first meeting met again at the same location. Lieutenant Cook testified that appellant began the meeting by stating that "his boys" had done the job and wanted their money. The officers then discussed with appellant the possibility that members of the Bethel Church had committed the bombing to get sympathy and attention. Appellant replied that "we four know they didn't do it and the blacks know they didn't do it." Appellant further stated that his boys had decided to go ahead with the bombing to ease the officers' fear of a botched job and to show the officers what type of job they could do. Appellant correctly described where the bomb had originally been placed and correctly described the bomb used.
Lieutenant Cook testified that, after the officers refused to pay $2,000, appellant asked for one-half the money and asked to be paid the other $1,000 on completion of another job. When the officers refused appellant replied that he was afraid to go back to his boys empty-handed. When Lieutenant Cook was asked if appellant specifically indicated whether or not he had authorized the bombing, appellant's only reply was that he had unsuccessfully tried to call his boys and that he knew that they had come to Birmingham.
On cross-examination, Lieutenant Cook testified that Commissioner Conner wanted appellant to come to Birmingham to discuss the attempted bombing of the Jewish synagogue. Lieutenant Cook also testified that, after the second meeting, appellant never asked for the money.
At the close of Lieutenant Cook's testimony, the state rested. Appellant's first witness was Lieutenant Cook, who was *Page 175 
recalled to the stand. Lieutenant Cook testified that his part of the investigation ended a few months after the second conversation with appellant and in his opinion the most fruitful investigation occurred during the second meeting. Lieutenant Cook further testified that he did not know why the case was delayed but he stated that the investigators turned over all of the information they had to the Justice Department in Washington.
Lieutenant Cook, as well as other officers, had maintained surveillance of the Bethel Church before the bombing and some of these officers had attended meetings to insure that violence did not erupt. He also stated that the church was bugged on certain occasions.
Appellant next recalled Reverend Shuttlesworth to the stand. Reverend Shuttlesworth testified that, during 1958, police officers were frequently at church meetings. He further testified that the church members had objected to the presence of the officers.
The first time Reverend Shuttlesworth had seen appellant was just prior to the trial. Reverend Shuttlesworth noted appellant walked with a slight limp.
James Russell, one of the church guards in 1958, was called to the stand. Prior to the explosion, Mr. Russell was in the balcony of the church watching the parsonage. He did not see anyone place the bomb. He did not see the five-gallon bucket before it exploded, nor had he seen the appellant before the trial.
Dean Dawson, an employee of State Farm Insurance Company, took the stand. Mr. Dawson explained the procedure used by State Farm employees when seeking reimbursement for travel expenses. The employees were to keep a record of their travel when traveling on company business. He testified that the records would probably indicate where one of the employees was traveling on a given day.
Appellant recalled Fire Marshal Aaron Rosenfield. Mr. Rosenfield explained the uses and characteristics of dynamite. According to Rosenfield, lit dynamite fuses usually emit black smoke and would therefore be difficult to see on a dark night. Mr. Rosenfield doubted someone could smell dynamite as far as 130 feet away.
Appellant took the stand. Appellant testified that he was born in Walker County, Georgia, and was fifty-four years old. Appellant graduated from law school in 1952 and later began working for State Farm Insurance Company as a claims adjustor. He was assigned to Savannah and then Dublin, Georgia. At the time of the bombing, appellant was working out of Dublin.
Appellant traveled within a seventeen county area, adjusting claims. State Farm required him to keep a daily record of his expenses and submit the vouchers at the end of the week. The vouchers would reflect his whereabouts on any given day. Appellant testified that he had lost the carbon copies of these records. Appellant made inquiries to State Farm about these records, but he was informed that the records had been destroyed.
Appellant stated that, as a result of having polio when he was young, he had had a slight limp from the time he was 2 1/2 years old.
Appellant testified that in June of 1958 he was staying with a friend outside of Atlanta. While appellant was out in the yard, Hugh Morris drove up. Morris told him that he wanted appellant to bomb Reverend Shuttlesworth's church in Birmingham, because someone out of the state was needed. Appellant contended that Morris was inconsistent in explaining who wanted to hire him. In any event, Morris told appellant that a Birmingham group was willing to pay appellant for his services at a later date.
According to appellant, Morris later made a second visit stating that he did not have the money yet because the Birmingham group did not trust him. Morris asked appellant to come to Alabama to meet this group and discuss his services. Appellant stated that he was perplexed as to how Morris was able to find him in Georgia. *Page 176 
Appellant did later go to Montgomery to work for a segregationist gubernatorial candidate. Appellant met Morris at the candidate's house and Morris asked appellant to ride with him to Birmingham. Morris told appellant that he did not have the money to pay for the bombing but that he wanted him to meet the Birmingham group.
In a Birmingham hotel parking lot, appellant met two other men who Morris claimed would pay appellant $2,000 to bomb Reverend Shuttlesworth's church. The two men were Lieutenant Cook and Captain Pattie. Appellant claimed that the three men told him that if a bomb did not get Reverend Shuttlesworth out of Birmingham they would pay to have him "eliminated."
Appellant further testified that the men said they did not have the $2,000 at that time but whenever they did they would pay him to bomb the Bethel Church. After the meeting Morris drove appellant by what Morris claimed was the Bethel Church. Appellant denied ever being on the church grounds. The pair then returned to Montgomery. The explosion occurred the next weekend.
Appellant testified that, after the church was bombed, Morris phoned him in Dublin, Georgia and told him that the Birmingham group wanted to see him again in Birmingham. Appellant agreed to meet the group, and an acquaintance, Richard Bowling, rode to Birmingham with appellant. Appellant met Morris at a Birmingham bus station, and rode with Morris back to the same hotel parking lot. Lieutenant Cook and Captain Pattie then joined the two men.
During this second conversation, appellant alleges that he asked the officers what they were up to and that the responses were contradictory. They first told him the blacks had bombed the church. Appellant further testified that Morris told him that the police had furnished him with a black informer who had bombed the church for $500. Appellant claims that the undercover agents wanted to talk with appellant this second time in order to offer appellant $10,000 to kill Reverend Shuttlesworth. The undercover agents never paid appellant any money.
After the second meeting, Morris and appellant met Richard Bowling. Appellant claims that Bowling knew about Morris, including the fact that he was a police informer, and that Morris and the undercover agents were trying to trap appellant. Appellant claimed he also knew this. Bowling allegedly confronted appellant with this information.
Appellant was asked why he participated in the two conversations if he knew he was being set up. He replied that Morris had earlier approached appellant offering to pay to have Martin Luther King, Jr., assassinated. Appellant testified that he felt that Morris's offers were an attempt "to entrap and send white people to jail merely because they believed in white supremacy and segregation." Appellant claimed he participated in the conversations to expose this plot to trap people.
Appellant was then asked if he had ever advocated the use of personal violence against any segment of society to which he replied that he had never advocated the use of such violence. Appellant also denied knowing anything about the design of bombs.
During cross-examination, the prosecution asked appellant if he had made certain extremely prejudicial statements concerning Jews and blacks, many of which advocated the use of violence. Appellant stated that he did not remember making a few of the statements. However, he acknowledged that he had made some of the other statements or at least similar statements.
The prosecution then questioned appellant about the two conversations he had with Hugh Morris and the two undercover agents. Appellant denied that he offered to bomb Reverend Shuttlesworth's church or any other target. He further denied that the bomb was already prepared. Appellant also denied telling the officers during the second conversation that his boys had bombed the church.
Appellant claimed that he knew before the meeting that he was dealing with undercover *Page 177 
agents attempting to have Reverend Shuttlesworth killed while appellant took the blame. Appellant admitted that he did not report this attempted set-up to local, state or federal authorities.
Appellant denied attempting to collect the $2,000 from the undercover agents. However, the appellant admitted that, while testifying in an earlier proceeding in Georgia, he testified that he had planned to take the $2,000. Appellant then admitted that he did try to collect the money.
Appellant was then asked about his whereabouts on the weekend of the explosion. Appellant claimed that he had worked on Saturday morning of June 28, 1958. That afternoon, appellant returned to Dublin, Georgia and went to see a friend. He and his friend then drove south of Dublin to visit his friend's girl friend. That night around 10:00 the two men drove to Atlanta. The next morning appellant went by the post office and later returned to Dublin.
Appellant testified that he was the attorney for the National State's Rights Party. He acknowledged that he had on numerous occasions stated that the party was "the most white racist, anti-Nigger, anti-Jew organization in the entire world." Appellant had been chairman of the party since 1969. Appellant was also asked if he had made other quoted prejudicial remarks about blacks and Jews.
On redirect, appellant again denied involvement in the bombing.
Appellant's last witness was John Robert Stallworth, a retired school teacher. Mr. Stallworth met appellant in 1957. Mr. Stallworth stated that he did not personally like appellant because of his methods and terminology used in furthering the cause of "conversation." Mr. Stallworth testified that appellant told him to beware of Lieutenant Cook, Hugh Morris and Captain Pattie. Appellant allegedly then told Stallworth that he was going to get back at the officers "for what they were trying to do to him and get some money for nothing."
Mr. Stallworth claimed that appellant told him that men were trying to trap him and that Hugh Morris was working for the police. Mr. Stallworth did not believe appellant had anything to do with the bombing.
Appellant first contends that the statute of limitations barred his prosecution and conviction.
The state argues that, as a procedural matter, appellant improperly raised his statute of limitations claim by including it with other matters in his "Plea of Abatement." Appellant also raised the issue in his motion for a new trial.
The state correctly states that § 15-15-(40-44), Alabama Code 1975, the statutory "plea of abatement," does not mention the statute of limitations. However, the code directs that, "In criminal proceedings, a plea is to be determined according to its substance, and not by its commencement or conclusion." §15-15-3. This court has stated that "substance over form" is the rule in reviewing a plea. Although appellant does argue the abatement issue in his plea of abatement, numerous other issues are raised, among them the statute of limitations. That the pleading was entitled "Plea of Abatement" does not make the plea invalid. Simpson v. State, Ala.Cr.App., 354 So.2d 317, cert. denied 354 So.2d 324, (Ala. 1978).
Also, "In most of the cases it has been held that the statute of limitations is available under the general issue and need not be pleaded specially." 22 C.J.S. Criminal Law, § 449 (1961). The Alabama appellate courts follow this liberal procedure. This court has consistently held that the statute need not be specially pleaded. Lambeth v. State, Ala.Cr.App.,380 So.2d 925, cert. denied 380 So.2d 926 (1980); Gambling v.State, 22 Ala. App. 442, 116 So. 507 (1928). In fact, this court has held that the state, as part of its burden of proof, must show that the offense was committed within the statute. If such is not shown, the state fails to make out its case. Harris v.State, 54 Ala. App. 10, 304 So.2d 252 (1974). *Page 178 
In light of the court's preference of substance over form, and of the fact that the statute of limitations issue is part of the state's burden of proof, the issue is properly before this court.
However, we find that appellant's prosecution was not barred by the statute of limitations.
Alabama uses a capital/non-capital distinction in determining the applicable statute of limitations. Basically, with certain exceptions, under both the 1940 Code and the 1975 Code, a capital felony carries an unlimited statute of limitations (Tit. 15 § 219, Code of Alabama 1940; § 15-3-5, Code of Alabama 1975) and a non-capital case carries a three-year statute of limitations. (Tit. 15, § 221; § 15-3-1). At the time appellant allegedly committed the crime, the crime was a capital offense, Tit. 14, § 123, Code of Alabama 1940. Subsequently, the U.S. Supreme Court in Furman v. Georgia, 408 U.S. 238,92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) declared the death penalty unconstitutional. At the time appellant was indicted, Alabama's new death penalty provision was in effect and did not include appellant's alleged felony. §§ 13-11-1 through 9, Code of Alabama 1975.
Appellant contends that, because of the Supreme Court's decision in Furman, supra, his felony was no longer a capital offense and thus carried a three-year statute of limitations under Tit. 15, § 221 1940 as of July, 1972, the date of theFurman decision. Appellant also contends that the fact that Alabama's new death penalty act which went into effect in March, 1976, did not include his felony is further reason to apply a three-year statute of limitation.
We do not agree with appellant's contentions for a number of reasons.
Although this specific issue has not been decided in an Alabama criminal case, we agree with the Florida Supreme Court that the statute of limitations in a criminal prosecution is a substantive right, rather than being merely a procedural matter.
We believe that the Florida Supreme Court in Manucy v.Wadsworth, Fla., 293 So.2d 345 (1974) clearly and concisely addressed the issue. In Manucy, as in the present case, the defendant had committed the felony before the Furman decision invalidated Florida's death penalty. Appellant was arrested, subsequent to the decision but prior to the enactment of Florida's new death penalty provision which reinstated the death penalty for his crime. Florida's statute of limitations, like Alabama's, was based on a capital/non-capital distinction in which capital felonies carried no statute of limitations.
The Florida court, in rejecting defendant's argument that the two year "non-capital" statute of limitations should apply, stated:
 "Petitioners therefore assert that the limitation statute should be given the status of procedure wherein the court looks to the limitation period in effect at the time of the arrest to determine whether the prosecution was timely instituted.
 "[1] A review of the authorities indicates that the statute of limitations in force and effect at the time of the incident giving rise to the criminal charges is controlling in determining whether prosecution has been timely commenced.
 "[2] Statutes of limitation in criminal prosecutions (`Limitation on Prosecution') are strictly creatures of statute; State v. Hickman, 189 So.2d 254
(Fla.App. 1966); and such are considered as vesting a substantive right, rather than being a procedural matter.
 "`. . . Whenever, however, it so clearly appears that the time of the commission of the offense was so long ago as that the accused is protected from accusation by the statute of limitations, he may be awarded this right on habeas corpus. There is as much a denial of what we have called the first right of every accused person, by holding him to answer an offense for which he cannot be lawfully prosecuted, as there is for one wholly unsupported by proofs. Whether the question is properly raised by demurrer, by special plea, or by the general issue plea, makes no difference. The right of protection is not a mere right.' *Page 179 
 "[3] Therefore, the period of the statute begins to run from the time of the alleged criminal conduct. In United States v. Auto Rental Co., 187 F. Supp. 603, 605 (W.D.Pa. 1960), the criminal conduct arose out of the alleged illegal payments of money. There the Court held:
 "`. . . Of course, if all the money was paid prior to the 5-year period, the Statute of Limitations would bar prosecution. Protection from prosecution under a Statute of Limitations is a substantive right, and the actual date or dates of payment may be of vital importance to the defendants.'
 "[4] In Florida, it has been held that the time of the commission of the offense is the point at which the court commences to have jurisdiction for the computation of the limitation period.
 "To hold otherwise might be to create a situation which is clearly unconstitutional. This could allow the Legislature to enlarge the statute of limitations until the criminal in question was tried and sentenced; clearly an application which is ex post facto.
 "[5] In the cases before us, the crimes were both allegedly committed prior to the decision in Furman v. Georgia, and therefore since the statutes of limitation are substantive, the two year period to institute prosecution is not applicable. [to bar the prosecution] (Footnotes omitted.)"
In adopting the reasoning and law of Manucy, supra, we find that the trial court properly applied the statute of limitations in effect at the time of the crime.
Also, this court addressed the general issue of whether a statute in effect at the time of the crime controls or whether a subsequent new statute passed after its commission controls.
In Hansen v. State, Ala.Cr.App., 375 So.2d 564 (1979), the defendant committed the crime of murder on March 27, 1978. On April 27, 1978, the legislature enacted a law changing the method of jury selection. The defendant was indicted on May 12, 1978.
The court, in holding that the statute in effect at the time of the crime, not at the time of the indictment, controlled, stated:
 "At the outset, we note that the Supreme Court of Alabama, in Bracewell v. State, Ala., [401 So.2d 123
(1979), reversed on other grounds, 449 U.S. 915, 101 S.Ct. 312, 66 L.Ed.2d 143 (1980),] in determining the effective date of a statute applicable to juveniles, stated:
 "Absent a clear expression in the Statute to the contrary, we think the law applicable at the time of the offense was intended to govern the offense, the offender, and all proceedings incident thereto, and we so hold. [Emphasis added.]"
At the time of the appellant's commission of the crime, the statute was a capital offense. Since that statute controls in determining the statute of limitations, appellant's act carried an unlimited statute of limitations. § 15-3-5, Code of Alabama 1975.
Appellant filed a motion to quash the indictment alleging a due process violation resulting from the long delay between the commission of the crime and his indictment. Appellant specifically alleges that, because of the death of certain witnesses along with the loss of certain records and dimming of memories, he was denied a fair trial in violation of the due process clause.
The Supreme Court held in United States v. Marion,404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), that a defendant's Sixth Amendment right to a speedy trial applies only to prosecutions formally begun, not to pre-accusation delays. Appellant does not argue a speedy trial violation.
Since appellant's prosecution is not barred by the statute of limitations, the possible due process violation must be addressed.
Although Marion, supra, recognized a due process protection separate from the statute of limitations, the due process clause has a limited role against oppressive delay, UnitedStates v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752
(1977); Chambliss v. State, Ala.Cr.App., 373 So.2d 1185, cert. denied, Ala., 373 So.2d 1211 (1979), and mere *Page 180 
passage of time per se is not a constitutional violation. U.S.v. Lovasco, supra, United States v. Doe, 10th Cir.,642 F.2d 1206 (1981). A defendant is charged with a heavier burden of proof in showing a preindictment delay due process violation than in showing a denial of his speedy trial rights. The Marion
court requires a showing by defendant of actual prejudice, not the mere possibility of prejudice, and that the delay "caused substantial prejudice to appellee's rights to a fair trial." The proof of actual and substantial prejudice due to the loss of potential witnesses must be "definite and non-speculative." This actual prejudice must be shown and cannot be presumed.Marion, supra; Chambliss, supra.
The central question becomes whether appellant met the heavy burden of proof by showing an actual and substantial prejudice resulting from the lengthy delay. We hold that he did not.
Appellant, in attempting to prove "actual prejudice," argued that the memories of witnesses had dimmed during the delay. However, in light of the protection afforded by the applicable statute of limitations, diminished recollection alone does not constitute substantial prejudice. Marion, supra.
More significantly, appellant claimed actual prejudice resulted from the death during the pre-indictment delay of certain potential witnesses, who, he alleges, would have testified in a manner significantly beneficial to his defense. The only "proof" appellant offered in showing actual prejudice was affidavits that he alleged contained what the potential witnesses would have testified to at trial.
The offered affidavits are simply self-serving assertions which do not prove actual prejudice. The affidavits are bare allegations of what the potential witnesses would have said with no extrinsic support in the record. The nature of such affidavits is much too speculative and non-definite to meet the heavy burden of proof required by Marion. Merely because appellant alleges that certain dead witnesses would testify for him and in a certain manner does not prove that the potential witnesses would testify in such a manner or even testify at all. We cannot accept such self-serving declarations as proof of actual prejudice resulting from the absence of these witnesses, and the affidavits alone do not satisfy the requirements of Marion.[1] United States v. Hauff, 7th Cir.,395 F.2d 555, 556 (1968); United States v. Mays, 9th Cir.,549 F.2d 670, 674 (1977); U.S. v. Hood, 8th Cir., 593 F.2d 293, 296
(1979), United States v. Revada 10th Cir., 574 F.2d 1047
(1978); United States v. King, 7th Cir., 593 F.2d 269 (1979);United States v. Saunders, 9th Cir., 641 F.2d 659, 665 (1980);United States v. Mills, 9th Cir., 641 F.2d 785, 789 (1980);United States v. Surface, 5th Cir., 624 F.2d 23, 25 (1981); See also Judge Barnett's concurring opinion in United States v.Radmall, 10th Cir., 591 F.2d 548 (1978).
Even if we speculate that the potential witnesses would have testified as appellant claims they would in his affidavits, we believe that the lack of most, if not all, of the allegedly lost testimony does not constitute actual prejudice.
First of all, much of the alleged testimony is rank hearsay, and it would be highly speculative as to whether a good deal of the alleged testimony would even be admissible. For example, appellant claims that one potential witness would have testified "that appellant told him that Hugh Morris claimed, etc."
Also, it is contested as to whom the testimony alleged in the first affidavit would benefit. Appellant claims that the potential witness would have testified that Hugh Morris, the informer, told appellant that he had hired someone else to bomb the church *Page 181 
in order to gain appellant's confidence. However, the state argues that the alleged testimony might help the state. In light of Cook's testimony that appellant was anxious to participate in the bombing, the alleged testimony may have been further evidence that appellant, as an accomplice, had started the process that ultimately led to the bombing.
A second affidavit alleged that another of appellant's deceased friends would have testified that appellant told him that appellant knew Hugh Morris and the others were trying to trap him and that he was "playing them along." If we ignore the great speculation that the potential witness would have even been allowed to testify to appellant's self-serving declaration as evidence of the matters declared, the alleged testimony would have been at best cumulative and would have added little to appellant's defense. At the trial, John Robert Stallworth testified to essentially the same thing. Appellant also gave the same account when he took the stand.
Finally, two of the four affidavits deal with potential alibi testimony which appellant claims would place him in Georgia at the time of the bombing. Appellant also contends that certain State Farm Insurance Company employee records would tend to prove the same. However, the trial court noted and the state concurred that appellant was on trial as an accomplice. There was never any contention by the state that appellant had actually ignited the bomb.
Moreover, even if appellant had proven actual prejudice, the Supreme Court has held that proof of actual prejudice is generally a necessary but not a sufficient element of a due process claim. Proof of actual prejudice is only the first step. If such proof is given, then the focus turns to the reasons for the delay. Lovasco, supra. Marion held that evidence of an intentional delay by the state to gain a tactical advantage would be a due process violation. Lovasco
apparently includes evidence of "reckless disregard of circumstances known to the prosecution . . ." 431 U.S. at 796, n. 7, 97 S.Ct. at 2048 n. 7.
We are hampered by our search in determining reasons for the delay because of the meager evidence on this issue in the record. In essence, no real reason for the delay can be found in the record. Thomas Cook, the Birmingham policeman who participated in the conversation with appellant, stated that he did not know why the prosecution was delayed and that he had no reason to believe any other evidence would have been forthcoming after the conversations. However, the other state investigators at least imply that the investigation had continued after two conversations with appellant. A fire and bombing expert testified that he had periodically returned to the site of the bombing, and a Birmingham police officer testified that the investigative report was an "ongoing report" and that his part of the investigation had been going on since four or five years previous to the trial.
During a post-trial hearing appellant placed both prosecutors on the stand. Neither prosecutor had been involved with the case before the indictment had been returned, and neither could give a reason for the delay. The prosecution did expressly deny that the delay had been more advantageous to the state than to appellant.
The only other reference to the subject arose during a post-verdict discussion in which appellant alleged that the state purposely delayed to gain a tactical advantage. Appellant claimed that the state, fearing a verdict from a 1958 all-white jury, deliberately delayed until blacks were allowed to serve. Appellant offered absolutely no proof of this allegation. After appellant alleged such an improper delay, the following discussion occurred:
 "THE COURT: I doubt if anybody sat down in 1958 and said we have to wait until the jury system isn't all white.
 "MR. BUCKLEY: [appellant's counsel]: I think they may have said we can't get a conviction.
 "THE COURT: That very well may have been. This prosecution will not be successful on this evidence.
(Emphasis added.)
"MR. BUCKLEY: That's what I assume. *Page 182 
 "THE COURT: I would almost find that as a fact for the reason of delay the State did not feel they would successfully prosecute in 58. Would you?
 "MR. DUNN: [prosecution]: I would say it would be a fair statement but not the reason of the jury."
The state also denies appellant's assertion of improper delay in its brief and arguments before the court, claiming that the prosecution delayed because it felt it did not have enough evidence to convict in 1958 in light of the relatively weak evidence then gathered. As stated before, there is at least an implication from the record that the investigation had not closed in 1958. The court in Lovasco, supra, noting the lack of evidence on the issue in the record, accepted the arguments of the government that the government delayed for investigative reasons. The court held that, even if prejudice were shown, such delay did not violate due process. See also United Statesv. Surface, 5th Cir., 624 F.2d 23 (1980).
In any event, without any proof in the record, we will not assume from the record that the state intentionally delayed to gain a tactical advantage or made a knowingly reckless disregard of appellant's ability to defend himself. Appellant's bare allegations of improper tactical delay on the state's part is insufficient to establish the necessary malevolent purpose.United States v. Medina-Arrellano, 5th Cir., 569 F.2d 349
(1978).
A calculated delay hurts the prosecution just as much as the defense. Since the prosecution in a criminal case has the burden of proving its case beyond a reasonable doubt and to a moral certainty, dimmed memories, evidence and unavailable witnesses have a special impact on the burden cast upon the prosecution. In light of the presumption of innocence, and the burden of proof, no prosecutor could reasonably believe that a nineteen-year delay in a case would improve the chances of a conviction. Indeed, the state lost the testimony of Captain Pattie, Commissioner Conner and Will Hall, the church guard who moved the bomb. A conviction was gained in the case inspite of the long delay. See Chambliss, supra.
We find that the pre-accusation delay did not violate due process guarantees.
Appellant also argues that there was not sufficient evidence for the jury to convict appellant. Appellant basically relies on one sentence in the record in which Lieutenant Cook, when asked if appellant had specifically authorized his boys to bomb the church, replied that appellant only stated he had unsuccessfully tried to call his boys and that he knew they had come to Birmingham.
This court in Chambliss, supra, addressing the same issue, stated:
 "We have held on numerous occasions that, where there is legal evidence from which the jury can by fair inference find the accused guilty, this Court has no right to disturb the verdict; (Alabama Digest, Criminal Law, Key 1159.2 (8). Whether there is such evidence is a question of law, its weight and probative value are for the jury.
 "A reviewing Court does not determine if the evidence proved defendant's guilt beyond a reasonable doubt and to a moral certainty but rather whether there was legal evidence presented from which the jury could draw an inference of guilt; where legal evidence is presented at trial from which the jury can, by fair inference, find the accused guilty, the reviewing court will not disturb the verdict of the jury. Daniels v. State, Ala.Cr.App., 343 So.2d 566.
 "In Young v. State, 283 Ala. 676, 220 So.2d 843, the Supreme Court said:
 "`Where the evidence presented raises questions of fact for the jury, and such evidence, if believed, is sufficient to sustain conviction the denial of a motion to exclude the state's evidence, the refusal to give the affirmative charge and the overruling of a motion for new trial does not constitute error.'"
We believe there is indeed sufficient evidence, if believed by the jury, to sustain appellant's conviction. There is testimony *Page 183 
that, during the meeting immediately prior to the bombing, appellant bragged that he and his boys were experts at bombing and would bomb any target for $2,000, including ReverendShuttlesworth's church. Appellant also at this meeting described a bomb already made matching the description of the bomb used. Appellant finally told the officers that he had been on the church grounds and studied its layout. This testimony was corroborated by a church member.
One week later the church was bombed.
There is testimony that appellant began the meeting subsequent to the bombing by claiming that his boys had done the bombing and "they wanted their money." When asked why his boys had gone ahead with the bombing, appellant responded that they wanted to ease concern about their competence. Appellant also gave a description of the bomb used and exactly where it was originally located that matched the description given by the church guards. Finally, appellant allegedly agreed to take $1,000 for the Shuttlesworth bombing and bomb another target for the remaining $1,000.
This court has held that a defendant is charged with the foreseeable consequences of any joint enterprise or conspiracy whether he directly authorized or contemplated the act or not.Howell v. State, Ala.Cr.App., 339 So.2d 138 (1976). Likewise, a defendant will also be held responsible for any act that a reasonable person could infer would result from such joint enterprise or conspiracy. Witherspoon v. State, Ala.Cr.App.,356 So.2d 743 (1978).
To be an accomplice in a crime one need not enter any formal agreement or express conspiracy. All that is needed is a community of purpose, and a community of purpose can be formed in a flash. Landry v. State, 56 Ala. App. 421, 321 So.2d 759
(1975). Community of purpose is normally proved by the conduct of the parties rather than by direct evidence. Stinson v.State, 55 Ala. App. 629, 318 So.2d 325, cert. denied, 294 Ala. 772, 318 So.2d 329 (1975).
Allegedly, after studying the church and its layout, appellant offered to bomb the church for a price. Appellant gave a general description of the type of bomb ultimately used. The church was bombed, appellant correctly described the bombing, and appellant demanded payment. This evidence, if believed, is certainly "legal evidence presented from which the jury could draw an inference of guilt".
Appellant next asserts that certain questions asked appellant concerning his views of the use of violence against minorities and his views of minorities in general constituted reversible error. We do not agree.
Appellant, just prior to his questioning on this issue, emphatically stated that he had never advocated the use of violence against other segments of society. The majority of statements appellant was questioned about dealt with such use of violence. Thus the questioning was properly conducted to impeach the witness.
Also, the remaining statements, if not directly advocating violence, certainly evidenced an intense hatred and aversion towards blacks and Jews. Such questioning was proper to prove motive for the bombing. This court in Chambliss, supra, in finding that certain testimony elicited which linked appellant with the Ku Klux Klan, was proper, held that:
 "In cases where, as here, the evidence is circumstantial, a wide range of testimony is admissible to show the motive of defendant for committing the crime charged. Turner v. State, 224 Ala. 5, 140 So. 447, Harden v. State, 211 Ala. 656, 101 So. 442.
 "In a case where the evidence is circumstantial, evidence of motive becomes of great importance. Harden v. State, supra; Hardy v. State, 51 Ala. App. 489, 286 So.2d 899. When circumstances point to the guilt of an accused, evidence of his motivation, even though weak, is admissible."
The record contains ample circumstantial evidence from which a jury could reasonably draw an inference of guilt. (1) *Page 184 
Appellant himself admitted meeting the undercover agents and discussing the bombing of the Bethel Church before the bombing occurred. (2) He further admitted that, shortly after the bombing, knowing that he had previously discussed the bombing of this church and that the church had been bombed, he agreed to meet with the undercover agents again. (3) There was testimony from a church member that appellant was seen at the church prior to the bombing. (4) Lieutenant Cook also testified that appellant had been to the church and had studied its layout. (5) There was testimony that, during the first meeting, appellant bragged about how he and "his boys" could handle any type of bombing, including bombing the Bethel Church. (6) There was also testimony that, during this first meeting, appellant gave a general description of a bomb already constructed that matched the description of the bomb ultimately used. (7) After the first meeting, the Bethel Church was bombed. (8) There was testimony that, at the second meeting, appellant told the officers that his boys had committed the bombing and wanted their money. (9) Appellant correctly described the bomb used and where it was originally placed, according to the testimony of Lieutenant Cook.
Appellant's final contention is that Jefferson County's "one for one" strike method, in comparison to a defendant's "two for one" strike method in other counties, is unconstitutional in that it violates due process and equal protection under the law. This court has upheld the constitutionality of such procedure. Tucker v. State, Ala.Cr.App., 383 So.2d 579, cert. denied, 383 So.2d 586 (Ala. 1980).
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.
* Reporter's note: The indictment in this case carried the name "Jessie Benjamin Stoner" with the alternate spelling "Jesse B. Stoner."
[1] The lack of supporting evidence that would tend to prove that the potential witnesses would testify as appellant claims would perhaps not be considered as adverse to appellant in a situation where he had no notice of the possibility of a criminal indictment. However, the heart of appellant's defense is the allegation that he was being "set up" or entrapped. It follows that appellant, a licensed attorney, would be aware that he would very likely be charged with the bombing some time in the future.