933 So.2d 377 (2004)
Bobby Frank CHERRY
v.
STATE of Alabama.
CR-02-0374.
Court of Criminal Appeals of Alabama.
October 1, 2004.
Opinion Denying Rehearing December 17, 2004.
Certiorari Denied January 7, 2005.
*379 Frank Myers, Birmingham (withdrew 10/01/2004); and Charles A. Flowers III, Birmingham, for appellant.
William H. Pryor, Jr., and Troy King, attys. gen., and Marc A. Starrett, asst. atty. gen., for appellee.
Alabama Supreme Court 1040342.
COBB, Judge.
On the morning of September 15, 1963, four young girls, Carole Robertson, Cynthia Wesley, and Addie Mae Collins, all 14 years old, and 11-year-old Carole Denise McNair were downstairs in the ladies' lounge of the Sixteenth Street Baptist Church in Birmingham, Alabama, preparing to participate in the church's first Youth Day Service. At approximately 10:22 a.m., a bomb exploded near the church's 16th Street stairway, resulting in a "high order explosion" that killed Carole, Cynthia, Addie Mae, and Carole Denise, and injured Addie Mae's sister, Sarah. (R. Vol. 19, 371.) Reverend John Haywood Cross evacuated the church and discovered the victims' bodies.
In the late 1970s, Robert Edward Chambliss was convicted of murder for his involvement in the bombing. Chambliss v. State, 373 So.2d 1185 (Ala.Crim.App.1979). In 2001, Thomas Edwin Blanton was convicted of murder for his involvement the bombing. Blanton v. State, 886 So.2d 850 (Ala.Crim.App.2003). During the May 2000 session of the Jefferson County grand jury, Bobby Frank Cherry was indicted for the murders of Carole, Cynthia, Addie Mae, and Carole Denise.[1]
On May 22, 2002, Cherry was convicted of four counts of murder, violations of Title 14, § 314, Ala.Code 1940. Cherry was sentenced to life in prison on each conviction; those sentences were to run consecutively.[2] Cherry filed a motion for a new trial; the hearing on the motion was continued two times by agreement of the parties. Ultimately, the trial court conducted a hearing on the motion on September 13, 2002, and denied the motion on the same day. This appeal followed. Cherry raises two issues on appeal.

I.
Cherry argues that the trial court erred by denying his motion to dismiss based on the preindictment delay between the 1963 bombing and his indictment in 2000.[3] Cherry contends that he suffered actual and substantial prejudice from the preindictment delay; he also maintains that from the delay the State "intentionally garnered a tactical advantage." (Appellant's brief, p. 27.) Cherry raised this argument to the trial court in his motion to dismiss and in his motion for a new trial.
"The Supreme Court held in United States v. Marion, 404 U.S. 307, 92 S.Ct. *380 455, 30 L.Ed.2d 468 (1971), that a defendant's Sixth Amendment right to a speedy trial applies only to prosecutions formally begun, not to pre-accusation delays. Appellant does not argue a speedy trial violation.
"Since appellant's prosecution is not barred by the statute of limitations, the possible due process violation must be addressed.
"Although Marion, supra, recognized a due process protection separate from the statute of limitations, the due process clause has a limited role against oppressive delay, United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); Chambliss v. State, Ala.Cr.App., 373 So.2d 1185, cert. denied, Ala., 373 So.2d 1211 (1979), and mere passage of time per se is not a constitutional violation. U.S. v. Lovasco, supra, United States v. Doe, 10th Cir., 642 F.2d 1206 (1981). A defendant is charged with a heavier burden of proof in showing a pre-indictment delay due process violation than in showing a denial of his speedy trial rights. The Marion court requires a showing by defendant of actual prejudice, not the mere possibility of prejudice, and that the delay `caused substantial prejudice to appellee's rights to a fair trial.' The proof of actual and substantial prejudice due to the loss of potential witnesses must be `definite and non-speculative.' This actual prejudice must be shown and cannot be presumed. Marion, supra; Chambliss, supra.
"The central question becomes whether appellant met the heavy burden of proof by showing an actual and substantial prejudice resulting from the lengthy delay."
"Moreover, even if appellant had proven actual prejudice, the Supreme Court has held that proof of actual prejudice is generally a necessary but not a sufficient element of a due process claim. Proof of actual prejudice is only the first step. If such proof is given, then the focus turns to the reasons for the delay. Lovasco, supra. Marion held that evidence of an intentional delay by the state to gain a tactical advantage would be a due process violation. Lovasco apparently includes evidence of `reckless disregard of circumstances known to the prosecution ...' 431 U.S. at 796, n. 7, 97 S.Ct. at 2048 n. 7."
"In any event, without any proof in the record, we will not assume from the record that the state intentionally delayed to gain a tactical advantage or made a knowingly reckless disregard of appellant's ability to defend himself. Appellant's bare allegations of improper tactical delay on the state's part is insufficient to establish the necessary malevolent purpose. United States v. Medina-[Arellano], 5th Cir., 569 F.2d 349 (1978)."
Stoner v. State, 418 So.2d 171, 179-80, 181, 182 (Ala.Crim.App.1982).

A. Actual Prejudice
Cherry quotes at length from his motion to dismiss, listing 12 witnesses who "are shown to have direct knowledge and/or involvement in the explosion" and who are now missing or deceased. He contends that the inability to interview these witnesses caused him actually prejudice. He speculates as to the "favorable" testimony of two of those witness: the first, an informant for the Federal Bureau of Investigation ("FBI"), would have testified that, when asked, Cherry stated that he "didn't know anything about" the bombing *381 (Appellant's brief, p. 31); and the second, a member of the Ku Klux Klan, would have testified that "he had solved the crime 14 years earlier, but ... it was never brought to trial because too many people in high places would [have been] embarrassed." (Id.) Additionally, Cherry lists several other witnesses, all family members of Cherry, and relates the favorable testimony, including alibi testimony, that they "would have been expected to give." (Appellant's brief, p. 30.)[4]
"A defendant must not only prove that the preindictment delay prejudiced him, but he must also prove that the resulting prejudice was substantial. Crawford v. State, [342 So.2d 450 (Ala.Crim.App. 1977)]; Arnold v. McCarthy, 9 Cir., 566 F.2d 1377 [(1978)]; United States v. Catano, 5 Cir., 553 F.2d 497 [(1977)].
"A real possibility of prejudice will not suffice, actual prejudice must be shown, and cannot be presumed. . . .
"Arnold v. McCarthy, [566 F.2d 1377 (9th Cir.1978)], holds that the assertion that a missing witness might have been helpful does not establish the actual prejudice required by the decision of the United States Supreme Court in [United States v.] Marion, [404 U.S. 307 (1971)]. Proof of actual prejudice due to the loss of witnesses must be `definite and nonspeculative.'"
Chambliss v. State, 373 So.2d 1185, 1203 (Ala.Crim.App.1979).
"Merely because appellant alleges that certain dead witnesses would testify for him and in a certain manner does not prove that the potential witnesses would testify in such a manner or even testify at all. We cannot accept such self-serving declarations as proof of actual prejudice resulting from the absence of these witnesses, and the affidavits alone do not satisfy the requirements of [United States v. Marion, 404 U.S. 307 (1971)]. United States v. Hauff, 7th Cir., 395 F.2d 555, 556 (1968); United States v. Mays, 9th Cir., 549 F.2d 670, 674 (1977); U.S. v. Hood, 8th Cir., 593 F.2d 293, 296 (1979), United States v. Revada[,] 10th Cir., 574 F.2d 1047 (1978); United States v. King, 7th Cir., 593 F.2d 269 (1979); United States v. Saunders, 9th Cir., 641 F.2d 659, 665 (1980); United States v. Mills, 9th Cir., 641 F.2d 785, 789 (198[1]); United States v. Surface, 5th Cir., 624 F.2d 23, 25 (198[0]); [s]ee also Judge Barnett's concurring opinion in United States v. Radmall, 10th Cir., 591 F.2d 548 (1978)."
Stoner, 418 So.2d at 180 (footnote omitted). Therefore, Cherry's self-serving declarations that some now unavailable witnesses would have given testimony favorable to Cherry are not sufficient to establish that Cherry was actually and substantially prejudiced by the preindictment delay.

B. Intentional Delay
Cherry makes the blanket assertion that the death of "a multitude of witnesses" worked "to the State's advantage." (Appellant's brief, p. 33.) He also asserts, without presenting proof of the assertion at the hearing, that, by "intentionally" failing to prosecute Cherry in the 1970s when Chambliss was prosecuted, the State successfully waited until "the jury changed to the State's benefit." (Id.)
"[W]ithout any proof in the record, we will not assume from the record that the *382 state intentionally delayed to gain a tactical advantage or made a knowingly reckless disregard of appellant's ability to defend himself. Appellant's bare allegations of improper tactical delay on the state's part is insufficient to establish the necessary malevolent purpose. United States v. Medina-[Arellano], 5th Cir., 569 F.2d 349 (1978)."
Stoner, 418 So.2d at 182. There is no proof in the record before us that the State intentionally caused the preindictment delay. At trial, defense counsel alleged:
"How do we go about proving that the State deliberately delayed? I mean[,] it was deliberate. I mean[,] no one is going to come out and admit that. And I'm not here saying that [the present day prosecutors] made a conscious effort that they weren't going to prosecute this case until now."
(R. 82.) We are left, then, with mere bare assertions of intent on the part of the State; without more, Cherry's argument that the State intentionally caused the preindictment delay is without merit.
In fact, we note that the record supports the State's assertion that it did not intentionally cause the preindictment delay. The following facts from the trial of Cherry's codefendant Blanton were equally explored during the hearing in this case:
"[T]he prosecutor explained that the FBI had been involved in the investigation of the case since the 1960s, but that it did not have enough evidence to prosecute [Blanton] federally because it did not have any evidence to show that there had been an interstate transportation of explosives. He further explained that, although the State prosecuted Robert Chambliss for the bombing in 1977 and used some information from the FBI, that prosecution was based primarily on information derived through a separate investigation by the State and that the FBI provided limited information at the insistence of the State based on information the State investigation had revealed. Finally, he explained that the FBI did not share most of the information it had with the State until 1997."
Blanton, 886 So.2d at 881. The record reflects that the FBI did not cooperate with the State until 1997, a mere three years before Cherry was indicted for the murders. Certainly, three years is not such an egregiously long period of time for the State to investigate and to build its case against Cherry for a crime committed four decades early. This is particularly true in light of the fact that the record reflects that, in 1997, Cherry, who was living in Mabank, Texas, was interviewed by the FBI and by local law enforcement personnel. Shortly after the interview, Cherry held a press conference to declare his innocence. It was this press conference that led a number of witnesses, including Cherry's granddaughter, to come forward to give law enforcement information about Cherry's involvement in the bombing. Neither the FBI nor the State had been aware of those witnesses before the press conference.
Finally, there is some inference in Cherry's argument that he should have been arrested sooner, perhaps at the first hint of his involvement in the bombing. We spoke to this argument in Chambliss, 373 So.2d at 1204:
"As the Court said in United States v. Lovasco, [431 U.S. 783 (1977)], `The decision whether to prosecute, therefore, required a necessarily subjective evaluation of the strength of the circumstantial evidence available and the credibility of respondent's denial. Even if a prosecutor concluded that the case was weak and further investigation appropriate, he would have no assurance that a reviewing *383 court would agree. To avoid the risk that a subsequent indictment would be dismissed for preindictment delay, the prosecutor might feel constrained to file premature charges, with all the disadvantages that entails.'
"The Supreme Court of the United States said in Hoffa [v. United States, 385 U.S. 293, 310 (1966)], and quoted in [United States v.] Marion, [404 U.S. 307, 325 n. 18 (1971)]:
"`There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.'"
Short of proof of an intentional delay on the part of the State to prosecute, we do not second-guess the decisions of law enforcement regarding arrest, and we do not second-guess the prosecution's decisions regarding indictment.
For the reasons stated above in Parts I.A. and B., we hold that Cherry's argument that his right to due process was violated by the preindictment delay is without merit.

II.
Cherry also argues that the trial court erred by denying his pretrial motion for a change of venue and his renewed motion for a change of venue made after voir dire was conducted. He cites as reasons for a change of venue the civil rights history of Birmingham, Alabama, and the quantity of media coverage and publicity surrounding the bombings, the previous trials, and his arrest. He also cites a telephone poll conducted by a professor of political science in preparation for Blanton's trial.
"`"A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court's ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr. App.1983)."
"`Joiner v. State, 651 So.2d 1155, 1156 (Ala.Cr.App.1994).'
"Clemons v. State, 720 So.2d 961, 977 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998). `The mere fact that publicity and media attention were widespread is not sufficient to warrant a change of venue. Rather, Ex parte Grayson[, 479 So.2d 76 (Ala.1985),] held that the appellant must show that he suffered actual prejudice or that the community was saturated with prejudicial publicity.' Slagle v. State, 606 So.2d 193, 195 (Ala. Crim.App.1992). `"Moreover, the passage of time cannot be ignored as a factor in bringing objectivity to trial."' Whisenhant v. State, 555 So.2d 219, 224 (Ala.Crim.App.1988), aff'd, 555 So.2d 235 (Ala.1989) (quoting Dannelly v. State, 47 Ala.App. 363, 364, 254 So.2d 434, 435 (Ala.Crim.App.1971)).
"`In connection with pretrial publicity, there are two situations which mandate a change of venue: 1) when *384 the accused has demonstrated "actual prejudice" against him on the part of the jurors; 2) when there is "presumed prejudice" resulting from community saturation with such prejudicial pretrial publicity that no impartial jury can be selected. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Rideau [v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)]; Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Coleman v. Zant, 708 F.2d 541 (11th. Cir.1983).'
"Hunt v. State, 642 So.2d 999, 1042-43 (Ala.Crim.App.1993), aff'd, 642 So.2d 1060 (Ala.1994)."
Blanton, 886 So.2d at 876-77.

A. Presumptive Prejudice
Cherry argues that, based on the publicity surrounding the trial, we should presume prejudice from the trial court's denial of his motion for a change of venue. We addressed this same argument, including the results of the same telephone poll, in Blanton:
"We must first determine whether the pretrial publicity resulted in `presumptive prejudice.' For prejudice to be presumed under this standard, the defendant must show: 1) that the pretrial publicity was prejudicial and inflammatory and 2) that the prejudicial pretrial publicity saturated the community where the trial was held. See Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985). Under this standard, a defendant carries an extremely heavy burden of proof.
"`[The appellant] relies on the "presumed prejudice" standard announced in Rideau [v. Louisiana, 373 U.S. 723 (1963)], and applied by the United States Supreme Court in Estes [v. Texas, 381 U.S. 532 (1965),] and Sheppard [v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966)]. This standard was defined by the Eleventh Federal Circuit Court of Appeals in Coleman v. Kemp, 778 F.2d 1487 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). The court stated: "Prejudice is presumed from pretrial publicity when pretrial publicity is sufficiently prejudicial and inflammatory and the prejudicial pretrial publicity saturated the community where the trials were held." 778 F.2d at 1490 (emphasis added [in Hunt]). See also Holladay v. State, 549 So.2d 122, 125 (Ala. Cr.App.1988), affirmed, 549 So.2d 135 (Ala.), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989).
"`In determining whether the "presumed prejudice" standard exists the trial court should look at "the totality of the surrounding facts." Patton v. Yount, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984); Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The presumptive prejudice standard is "rarely" applicable, and is reserved for only "extreme situations." Coleman v. Kemp, 778 F.2d at 1537. "In fact, our research has uncovered only a very few . . . cases in which relief was granted on the basis of presumed prejudice." Coleman v. Kemp, 778 F.2d at 1490.
"`[The appellant] had the burden of showing that "prejudicial pretrial publicity" saturated the community. Sheppard, supra. "[T]he burden placed upon the petitioner to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy *385 one." Coleman v. Kemp, 778 F.2d at 1537. "Prejudicial" publicity usually must consist of much more than stating the charge, and of reportage of the pretrial and trial processes. "Publicity" and "prejudice" are not the same thing. Excess publicity does not automatically or necessarily mean that the publicity was prejudicial.
"`. . . .
"`. . . In order to meet the burden of showing the necessity for a change of venue due to pretrial publicity on the grounds of community saturation, "the appellant must show more than the fact `that a case generates even widespread publicity.'" Oryang v. State, 642 So.2d 979, 983 (Ala.Cr.App. 1993), quoting, Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, [502] U.S. [1030], 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
"`"`Newspaper articles alone would not necessitate a change in venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945].'"
"`Thompson, 581 So.2d at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala.1977).
"`A review of the media coverage contained in the record on appeal demonstrates that the majority of print media coverage was reasonably factual and more or less objective. We find that the reportage by the news media did not result in the community being so "pervasively saturated" with prejudicial publicity so as to make the court proceedings nothing more than a "hollow formality." Rideau, supra.'
"Hunt, 642 So.2d at 1043-44. `To justify a presumption of prejudice under this standard, the publicity must be both extensive and sensational in nature. If the media coverage is factual as opposed to inflammatory or sensational, this undermines any claim for a presumption of prejudice.' United States v. Angiulo, 897 F.2d 1169, 1181 (1st Cir.1990).
"In support of his motion for a change of venue, the appellant introduced evidence concerning a telephone poll of 400 Jefferson County citizens200 white and 200 blackabout the case. Of the people responding to the poll, 99.3 percent indicated that they had heard about the bombing. Of those who had heard about the bombing, 28.4 percent indicated that they thought the appellant was guilty, 17.0 percent thought the appellant was probably guilty, 2.0 percent thought the appellant was probably not guilty, and 1.2 percent thought the appellant was not guilty. However, a majority, 51.4 percent, were uncertain as to the appellant's guilt at that time. When the respondents were asked whether they could set aside what they had heard about the case and decide it based solely on the evidence presented in court, a majority, 55.4 percent, indicated that they could set aside what they had heard; 32.7 percent indicated that they could not set aside what they had heard; and 12.0 percent were not certain. The appellant also introduced numerous newspaper articles from local newspapers that covered the case from its inception through the trial.
"Although the appellant presented evidence that indicated that many of the citizens of Jefferson County had heard about the bombing through the media, he has not shown that the information *386 presented by the media was prejudicial. We have examined the media materials he presented to the trial court, and we find that most of the reports were factual and relatively objective rather than accusatory, inflammatory, or sensational. Therefore, we conclude that the materials did not contain prejudicial information. Further, the appellant did not prove that the media attention inflamed or saturated the community so that there was an emotional tide against him. Thus, he has not shown that the pretrial publicity in this case was so inherently or presumptively prejudicial as to constitute one of those `extreme situations' that warrant a presumption of prejudice from pretrial publicity."
Blanton v. State, 886 So.2d at 877-79. As in Blanton, we find the results of the telephone poll to be noncompelling evidence that the community was saturated with prejudicial pretrial publicity. Additionally, we have examined the pieces of media submitted with the motion for a change of venue, to the extent that they are present in the record, and we have found those to be simply factual, objective, and nonsensational. Therefore, Cherry has not proven that the community was so saturated by prejudicial media coverage that there was an "emotional tide" against him in Birmingham, that is, that he was prejudiced can be presumed from the trial court's failure to grant his motion for a change of venue.

B. Actual Prejudice
Cherry also argues that the trial court should have granted his renewed motion for a change of venue entered after voir dire because "the jury demonstrated that actual prejudice existed." (Appellant's brief, p. 39.) At trial, during his renewed motion, Cherry reiterated that much publicity had surrounded the trial and stated that "[s]ome of the veniremembers here were honest enough to tell us that they were concerned about mob violence, about riots." Cherry also complained that two jurors knew people who had been arrested "in a protest." (R. Vol. 17, pp. 17-18.)
"`The "actual prejudice" standard is defined as follows:
"`"To find the existence of actual prejudice, two basic prerequisites must be satisfied. First, it must be shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. Irvin v. Dowd, 366 U.S. [717,] 727, 81 S.Ct. [1639,] 1645, [6 L.Ed.2d 751, 758-59 (1961)]. Second, these jurors, it must be determined, could not have laid aside these preformed opinions and `render[ed] a verdict based on the evidence presented in court.' Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643 [6 L.Ed.2d at 756]."
"`Coleman v. Zant, 708 F.2d [541, 544 (11th Cir.1983)].'
"Hunt [v. State, 642 So.2d 999, 1043 (Ala.Crim.App.1993)].
"`Furthermore, in order for a defendant to show prejudice, the "`proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App. 1978)." Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985).'
"Oryang v. State, 642 So.2d 979, 983 (Ala.Crim.App.1993)."
Blanton, 886 So.2d at 879. The record reflects that the trial court dismissed for cause any juror who indicated during voir dire that or she had formed an opinion as *387 to Cherry's guilt. According to the prosecutor,[5] the remaining members of the venire had all heard of the bombing, but maintained that they could and would form their own opinions as to Cherry's guilt based solely on the evidence presented during the trial. Therefore, Cherry has not shown that any of the jurors were actually prejudiced against him.
For the reasons stated in Part II.A. and B., Cherry's argument that the trial court should have granted his motions for a change of venue is without merit.
For the reasons stated in the opinion above, Cherry's convictions and sentences in these four cases are affirmed.
AFFIRMED.
McMILLAN, P.J., and BASCHAB, SHAW, and WISE, JJ., concur.

On Application for Rehearing
COBB, Judge.
On May 22, 2002, Bobby Frank Cherry was convicted of four counts of murder. The trial court imposed four consecutive life sentences. On appeal, this Court affirmed his convictions and sentences. Cherry v. State, 933 So.2d 377 (Ala.Crim. App.2004).
On October 15, 2004, Cherry filed an application for rehearing in this Court. On November 19, 2004, this Court overruled his application for rehearing. On that same date, Cherry's attorney filed a "Suggestion of Death and Motion for Remand to Vacate Convictions," stating that Cherry had died on November 18, 2004, the day before this Court overruled his application for rehearing.
In his motion, Cherry's attorney, citing to the Alabama Supreme Court's case of Ex parte Estate of Cook, 848 So.2d 916 (Ala.2002), requested that this Court dismiss Cherry's appeal as moot and remand this cause to the trial court for that court to vacate Cherry's four murder convictions. On November 23, 2004, the State filed a response, requesting that this Court allow Cherry's convictions to stand; the State argued that Cherry's application for rehearing was a discretionary action and, therefore, that Ex parte Estate of Cook was inapplicable. On November 30, 2004, Cherry's attorney responded to the State, arguing that Cherry's convictions were to be vacated because, the attorney contended, Cherry's right to file an application for rehearing was "absolute" and also arguing that the judgment of this Court was not final because we had not yet issued a certificate of judgment. For the reasons below, we agree with the State. Cherry's convictions and sentences stand.
In Ex parte Estate of Cook, Cook was convicted in municipal court of driving under the influence. He filed a notice of appeal to the circuit court for a trial de novo. At the circuit court level, a mistrial was declared and a new trial ordered. While awaiting a second trial in circuit court, Cook died. Cook's counsel sought the dismissal of the charge against Cook, arguing that Cook's death constituted an abatement of his prosecution and that his conviction in municipal court should be vacated as a nullity. The Alabama Supreme Court held that, "under the circumstances presented [t]here," Cook's conviction in municipal court was "to be vacated as a result of his death during the course of his de novo appeal to the circuit court." Cook, 848 So.2d at 917, 919. The Alabama Supreme Court reasoned:

*388 "The facts of this case present an appropriate occasion for the application of the ab initio abatement rule. At the time of Cook's death, he was exercising an appeal as of right; further, his appeal to the circuit court was de novo; he was being retried as if the municipal court conviction did not exist, and he had no burden to show reversible errorthe City had the burden of proving his guilt. § 12-14-70(c), Ala.Code 1975; Rule 30, Ala. R.Crim. P. Cook's first trial in the circuit court resulted in a hung jury, and a second trial could not be had because of his death."
Cook, 848 So.2d at 919. The Alabama Supreme Court further noted in a footnote:
"Because the issue has not been presented in this case, we do not address whether the abatement ab initio rule applies when the death of a criminal defendant occurs during the course of a discretionary appeal."
848 So.2d at 919 n. 3.
In Wheat v. State, 907 So.2d 458 (Ala. Crim.App.2004), Wheat was convicted in circuit court of five counts of capital murder and was sentenced to death. Wheat filed his notice of appeal to this Court on June 12, 2003. The trial judge subsequently filed a "Notice of Death," stating that Wheat had died on May 6, 2004. In holding Wheat's appeal as moot and remanding his case to the trial court for that court to vacate his capital-murder convictions, this Court stated:
"The Supreme Court in Cook intended to adopt the rule followed by the majority of state and federal jurisdictions when a defendant dies while an appeal as of right of his or her conviction is pending the prosecution abates ab initio. We are bound by the decisions of the Alabama Supreme Court. § 12-3-16, Ala.Code 1975. Wheat died while his appeal granted to him as of right by statute was pending before this Court. According to the reasoning of Cook, Wheat's conviction was not entitled to any degree of finality."
Wheat, 907 So.2d at 460 (footnote omitted).[1]
Our initial inquiry, then, is whether filing an application for rehearing in Alabama constitutes a discretionary appeal or an appeal as of right. We have addressed this issue in Kinsey v. State, 545 So.2d 200, 203 (Ala.Crim.App.1989), in determining whether a defendant has a right to counsel in the filing of an application for rehearing:
"In this case, the dispositive question is whether a rehearing in the Alabama Court of Criminal Appeals is a matter of right or a matter of discretionary appellate review? We hold that a rehearing before this Court is a matter of discretion to which the right of counsel does not attach.

*389 "In Alabama, all persons convicted of a criminal offense are granted the right to an appeal by Alabama Code 1975, § 12-22-130. This appeal is a right granted to the defendant and is to the Court of Criminal Appeals. Alabama Code 1975, § 12-3-9. Any subsequent review of a criminal conviction by a higher state appellate court is by writ of certiorari to the Alabama Supreme Court. Review by certiorari is entirely discretionary with our Supreme Court (except in capital cases[[2]]). See [Ala. R.App. P.] Rule 39; Ex parte Sellers, 250 Ala. 87, 33 So.2d 349 (1948). The Supreme Court will consider a petition for writ of certiorari `only after the court of appeals has overruled an application for rehearing. . . .' [Ala. R.App. P.] Rule 39(a). Thus, a rehearing by this Court lies somewhere between a defendant's first appeal as a matter of right and a subsequent discretionary review.
"With regard to rehearings,
"`it is generally the rule that, except in cases provided for by statute, a rehearing is not a matter of right, but a privilege given by the appellate court, and governed and limited by its rules. Accordingly it is often held that an application for a rehearing of an appeal addresses itself to the discretion of the court, and its decision in the matter is final.' 5 C.J.S. Appeal & Error § 1409 (1958) (footnotes omitted) (emphasis added).
"Section 12-22-130, which provides for an appeal as of right, does not contain any reference to a rehearing. We have not found any statute which grants rehearing by this Court as a matter of right."
As for the rationale for treating an appeal as of right differently from a discretionary appeal in the event of the defendant's death, we turn to West v. United States, 659 A.2d 1260, 1261-62 (D.C.1995), in which the court reasoned:
"Appellant argues that this court's ruling in Howell v. United States, 455 A.2d 1371 (D.C.1983) (en banc), supports his contention that his conviction should be abated ab initio, pointing out that in Howell we stated that `[w]hen the defendant dies before he has exhausted his right of appeal' the underlying conviction should be vacated and the prosecution abated ab initio. Id. at 1372. We disagree.
"Consideration of the procedural background of Howell, quite different from that of the present case, clarifies why our holding there does not support appellant's contention. A division of this court reversed Howell's conviction for possession of marijuana and remanded the case with directions to suppress the marijuana evidence. Id. Upon learning of the division's decision, appellant's counsel tried to telephone Howell, only to learn that he had been murdered some five months before the division opinion issued. Id. Upon being notified of that fact, government counsel filed a suggestion of death. Id. Over the objection of Howell's counsel, the division vacated its opinion reversing the conviction and dismissed the appeal, nunc pro tunc. Id. The en banc court took a different view, ordering not only that the appeal be dismissed, but also that the case should be remanded to the trial court so that the conviction could be vacated and the prosecution abated by reason of death. Id. at 1373.
"In reaching our decision in Howell, we relied on the Supreme Court's decision *390 in Dove v. United States, 423 U.S. 325, 96 S.Ct. 579, 46 L.Ed.2d 531 (1976), a case in which the Court dismissed a petition for certiorari that was pending at the time the petitioner died. In its brief opinion in Dove, the Supreme Court stated that to the extent that its holding was inconsistent with its previous opinion in Durham v. United States, 401 U.S. 481, 91 S.Ct. 858, 28 L.Ed.2d 200 (1971), Durham was overruled. Upon the death of the petitioner in Durham while his petition for certiorari was pending, the Supreme Court had disposed of the case by granting the petition for certiorari, vacating the judgment below, and remanding the case to the District Court with instructions to dismiss the indictment. While the language of Dove was cryptic, it is frequently interpreted as holding that, upon the death of an appellant, appeals of right should be treated differently from discretionary appeals. See, e.g., United States v. Pauline, 625 F.2d 684 (5th Cir.1980); United States v. Moehlenkamp, 557 F.2d 126, 128 (7th Cir. 1977); Jones v. State, 302 Md. 153, 486 A.2d 184 (1985).
"This court was of that view in Howell, stating: `The rationale for distinguishing between cases of death pending an appeal as of right and cases involving death pending discretionary review of a conviction is compelling.' Howell, supra, 455 A.2d at 1373. In making that observation, this court relied upon and cited portions of the opinion in Moehlenkamp, supra, where the United States Court of Appeals for the Seventh Circuit stated:
"`The mootness of an appeal of right taken from a criminal conviction brings into play different considerations than does the mootness of a petition for a writ of certiorari committed to the Supreme Court's discretion. As Mr. Justice Blackmun noted in his dissent to Durham, supra at 484, 91 S.Ct. at 860-61, a court of appeals confronts a "contrasting and very different situation" in disposing of a moot appeal of right than does the Supreme Court in disposing of a moot petition for certiorari. The Supreme Court may dismiss the petition without prejudicing the rights of a deceased petitioner, for he has already had the benefit of the appellate review of his conviction to which he was entitled of right. In contrast, when an appeal has been taken from a criminal conviction to the court of appeals and death has deprived the accused of his right to our decision, the interests of justice ordinarily require that he not stand convicted without resolution of the merits of his appeal, which is an "integral part of [our] system for finally adjudicating [his] guilt or innocence." Griffin v. Illinois, 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956).'
"557 F.2d at 128; Howell, supra, 455 A.2d at 1373.
"The highest court of Maryland has stated in a similar situation:
"`Where the deceased criminal defendant has not had the one appeal to which he is statutorily entitled, it may not be fair to let his conviction stand. But, on the other hand, where the right of appeal has been accorded and the Court of Special Appeals has decided that there was no reversible error, no unfairness results in leaving the conviction intact even though an application for further review has not been resolved when the defendant dies. The mere possibility that this Court might have reversed the conviction is not sufficient ground to order dismissal of the entire indictment.'

*391 "Jones, supra, 486 A.2d at 187."
(Footnote omitted.)
Cherry died while his application for rehearing was pending. Cherry's application for rehearing was a discretionary appeal, rather than an appeal of right. Because at the time of his death Cherry was engaged in a discretionary appeal rather than an appeal as of right, we withdraw our November 19, 2004, ruling denying his application for rehearing, which was unknowingly entered the day following his death, and we dismiss his application for rehearing as moot. We decline to remand this cause for the trial court to vacate Cherry's convictions. Cherry's convictions and sentences stand as directed by this Court in its decision on direct appeal. Cherry v. State, supra.
DECISION OF NOVEMBER 19, 2004, WITHDRAWN; MOTION TO REMAND DENIED; AND APPLICATION FOR REHEARING DISMISSED AS MOOT.[*]
WISE, J., concurs. SHAW, J., concurs in the rationale in part and concurs in the result, with opinion. McMILLAN, P.J., dissents. BASCHAB, J., dissents, with opinion.
SHAW, Judge, concurring in the rationale in part and concurring in the result.
Recently, in Wheat v. State, 907 So.2d 458 (Ala.Crim.App.2004), this Court held that the Supreme Court in Ex parte Estate of Cook, 848 So.2d 916 (Ala.2002), in addressing the threshold issue presented in that case, "intended to adopt the rule followed by the majority of state and federal jurisdictionswhen a defendant dies while an appeal as of right of his or her conviction is pending the prosecution abates ab initio." 907 So.2d at 460 (footnote omitted). This Court's decision in Wheat was, in my view, dictated by the Alabama Supreme Court's decision in Cook; therefore, I cannot agree with the majority's statement in footnote one that this Court in Wheat expanded, rather than applied, the holding in Cook. Otherwise, I agree with the majority opinion.
I agree with the majority that the Supreme Court's decision in Cook does not mandate the extension of the abatement ab initio rule to the facts of the present caseinvolving the death of a criminal defendant during the course of discretionary appellate review. In the absence of a clear indication from the Alabama Supreme Court as to its perception of the *392 breadth of the abatement ab initio rule, and in light of the valid policy considerations in West v. United States, 659 A.2d 1260 (D.C.1995), for differentiating in this area of the law between an appeal of right and further discretionary appellate review, cited by Judge Cobb, I will not extend this Court's holding in Wheat. See also United States v. Pauline, 625 F.2d 684 (5th Cir. 1980). I also note that in United States v. Christopher, 273 F.3d 294 (3d Cir.2001), cert. denied, 536 U.S. 964, 122 S.Ct. 2674, 153 L.Ed.2d 847 (2002), a case cited as primary authority by the Supreme Court in Cook, the United States Court of Appeals for the Third Circuit also distinguished between an appeal as of right and discretionary review.
Therefore, I concur to dismiss the application for rehearing as moot. I also agree with the majority that Cherry's motion to dismiss the appeal as moot and to remand the case for vacation of his conviction and sentence is due to be denied.
BASCHAB, Judge, dissenting.
The appellant's counsel has filed a petition for a writ of certiorari with the Alabama Supreme Court, but the Alabama Supreme Court has not ruled on that petition. Therefore, this court and the Alabama Supreme Court have concurrent jurisdiction over the appellant's motion for remand to vacate convictions. See generally Committee Comments to Rule 39(k), Ala. R.App. P., effective February 1, 1994. However, for the reasons set forth below, I believe we should defer to the Alabama Supreme Court in this case.[3] Therefore, I respectfully dissent.
In Ex parte Estate of Cook, 848 So.2d 916 (Ala.2002), the Alabama Supreme Court held that, when a defendant who has been convicted of a crime dies while he is challenging that conviction by an appeal taken as a matter of right, the conviction abates from its inception. In a footnote, the court also stated: "Because the issue has not been presented in this case, we do not address whether the abatement ab initio rule applies when the death of a criminal defendant occurs during the course of a discretionary appeal." Cook, 848 So.2d at 919 n. 3. As the main opinion correctly notes, a rehearing in this court is a matter of discretionary appellate review. Therefore, this case squarely presents the question of whether the abatement ab initio rule applies when the death of a criminal defendant occurs during the course of a discretionary appeal. Although this court has concurrent jurisdiction to rule in this case, our decision would not be binding on the Alabama Supreme Court. Rather,
"[t]he decisions of the Supreme Court shall govern the holdings and decisions of the courts of appeals, and the decisions and proceedings of such courts of appeals shall be subject to the general superintendence and control of the Supreme Court as provided by Constitutional Amendment No. 328."
§ 12-3-16, Ala.Code 1975. Because this court is bound by the decisions of the Alabama Supreme Court, because the Alabama Supreme Court could review our decision in this case, and in the interests of judicial economy and finality, the Alabama Supreme Court is in the best position to decide the issue. Therefore, we should defer to the Alabama Supreme Court and transfer the motion for remand to vacate *393 convictions to the Alabama Supreme Court. Accordingly, I respectfully dissent.
NOTES
[1] Cherry was also charged with multiple counts of arson; those charges were dismissed and are not the subject of this appeal.
[2] "Separate sentences of imprisonment imposed on a defendant for two or more offenses shall run consecutively, unless the judge at the time of sentencing directs otherwise, whether they are charged in the same charging instrument or by separate charging instruments." Rule 26.12(a), Ala. R.Crim. P. The trial judge did not direct that the sentences were to run concurrently.
[3] Cherry also contends that "[a] motion to dismiss for preindictment delay requires specific findings [to be made] by the trial court." Cherry never argued to the trial court that it should make specific findings upon the denial of his motion to dismiss; therefore, it is doubtful that this argument is properly before this Court. See generally Love v. State, 677 So.2d 1272, 1275 (Ala.Crim.App.1996). Additionally, Cherry does not provide any legal authority for this proposition, and we know of none; therefore, the argument is also without merit.
[4] We note that most of the hearing on the motion to dismiss focused on rehashing the investigation of the bombing and on defense counsel's attempts to discredit the investigation, which is more relevant to whether the State intentionally delayed prosecution. No further proof was offered concerning the quantity and quality of prejudice allegedly suffered by Cherry from the preindictment delay.
[5] A transcript of voir dire is not included in the record. Defense counsel did not contradict the prosecutor when he made this statement.
[1] In Wheat, this Court also opined:

"There is no indication in the Supreme Court's opinion that its holding in Cook is limited to an appeal to the circuit court from a municipal court conviction."
907 So.2d at 458. Upon further review, this comment may have slightly overstated the effect of the decision in Cook. The Alabama Supreme Court specifically noted that its decision was made "under the circumstances presented [t]here," Cook, 848 So.2d at 917, and also enumerated those circumstances that were unique to an appeal in Cook's case from municipal to circuit court: "his appeal to the circuit court was de novo; he was being retried as if the municipal court conviction did not exist[;] and he had no burden to show reversible error-the City had the burden of proving his guilt." Cook, 848 So.2d at 919. Therefore, apparently, the Alabama Supreme Court did indicate that its opinion in Cook was specific to the facts of that case. However, the Alabama Supreme Court did not state that the opinion was unavailable for extension in analogous situations, as this Court implicitly recognized in our decision in Wheat.
[2] Rule 39, Ala. R.App. P., was amended effective May 19, 2000, to make review by the Alabama Supreme Court discretionary in capital cases.
[*] Note from the reporter of decisions: On October 15, 2004, Cherry filed an application for rehearing of the October 1, 2004, opinion affirming his convictions and sentences. The Court of Criminal Appeals denied that rehearing on November 19, 2004. On that same day Cherry's counsel filed a "Suggestion of Death and Motion to Remand to Vacate Convictions." On December 3, 2004, Cherry's counsel filed a petition for the writ of certiorari with the Alabama Supreme Court, seeking a review of the Court of Criminal Appeals' affirmance of Cherry's convictions and sentences (no. 1040342). While Cherry's case was pending on certiorari review in the Supreme Court, the Court of Criminal Appeals on December 17, 2004, responded to the "Suggestion of Death" by withdrawing its November 19, 2004, decision, issuing an opinion addressing the vacation of Cherry's convictions, and dismissing the application for rehearing filed on October 15, 2004, as moot. On January 3, 2005, Cherry's counsel filed an application for rehearing of the December 17, 2004, decision of the Court of Criminal Appeals refusing to remand the cause for the trial court to vacate Cherry's convictions. On January 7, 2005, the Supreme Court denied certiorari review and issued its certificate of judgment. On January 21, 2005, the Court of Criminal Appeals denied the application for rehearing filed on January 3, 2005, and Cherry's counsel filed a petition for certiorari review in the Supreme Court of the issue whether Cherry's death should result in the vacation of his convictions (no. 1040646).
[3] This case is distinguishable from Strickland v. State, [Ms. CR-03-0167, October 20, 2004] ___ So.2d ___ (Ala.Crim.App.2004) (Baschab, J., dissenting), because an application for a rehearing was filed in this case before the appellant died and because a petition for certiorari review in the Alabama Supreme Court has been filed in this case.